1
2
3
4             UNITED STATES DISTRICT COURT
5           NORTHERN DISTRICT OF CALIFORNIA
6
7   JARVIS J. MASTERS,                          Case No.  4:20-CV-08206-HSG
8                  Petitioner,                  **ORDER DENYING MOTION FOR
                                                JUDGMENT ON THE PLEADINGS**
9        v.
                                                Re: Dkt. No. 47
10  CHANCE ANDES, Acting Warden,
    San Quentin Rehabilitation Center,          **CAPITAL CASE**
11
                   Respondent.
12
13
         Petitioner Jarvis J. Masters, a condemned inmate housed at San Quentin Rehabilitation

Center, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"),

challenging his 1990 convictions and sentence for first-degree murder and conspiracy to commit

first-degree murder.  Dkt. No. 1.  Before the Court is Petitioner's Motion for Judgment on the

Pleadings.  Dkt. No. 47.  Respondent has filed a Response, Dkt. No. 54, and Petitioner filed a

Reply, Dkt. No. 55.  For the reasons detailed below, the Court denies the motion.

I.    **FACTUAL BACKGROUND**

         According to the California Supreme Court's opinion on direct appeal, Petitioner, Andre

Johnson, Lawrence Woodard, and Rufus Willis engaged in a conspiracy in May 1985 in San

Quentin State Prison to plan the murder of a prison guard.  *People v. Masters*, 365 P.3d 861, 871,

62 Cal. 4th 1019, 1026 (2016).[1]  Petitioner and the others were members of a prison gang, the

---

[1] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), unless otherwise indicated in this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Black Guerilla Family ("BGF"), who decided to retaliate against Sergeant Dean Burchfield, a

2  guard they believed had been bringing weapons to members of a rival gang, the Aryan

3  Brotherhood ("AB").  *Id.*, 365 P.3d at 871-72, 62 Cal. 4th at 1026-27.  Sometime after 11:00 pm

4  on June 8, 1985, Johnson struck Burchfield in the chest with an inmate-made weapon.  *Id.*, 365

5  P.3d at 872, 62 Cal. 4th at 1029.  Burchfield died of a single wound to the chest.  *Id.*

6        At trial, Willis served as the State's primary witness, describing both the structure and

7  activities of the BGF as well as the conspiracy and participants in the murder.  *Id.*, 365 P.3d at

8  872, 62 Cal. 4th at 1028.  Willis, who was serving a sentence of twenty-five years to life for

9  murder and related crimes, joined the BGF at Folsom Prison in 1982.  *Id.*  Upon arriving at San

10  Quentin, Willis was assigned various BGF supervisory roles in each section where he was housed,

11  eventually becoming the intelligence officer, or "Akili," in the Carson Section of the prison.  *Id.*

12  Willis testified that Willie Redmond was the BGF commander of Carson Section, Woodard was a

13  lieutenant, and Petitioner was the security chief or "Usalama."  *Id.*  Redmond had notified Willis

14  that he was planning to have the BGF in Carson Section attack a guard, and he, Willis, Woodard,

15  and Petitioner met on the exercise yard to discuss these plans.  *Id.*

16        According to Willis, at the first meeting on the exercise yard, Petitioner presented a plan

17  for the BGF to attack the AB and the Mexican Mafia, another prison gang.  *Id.*  Redmond ordered

18  Petitioner to change the plan to focus on attacking prison guards.  *Id.*  At the next meeting,

19  Petitioner presented a plan that included officers to assault.  *Id.*  Redmond decided that the Carson

20  BGF would target Burchfield, and Willis chose Johnson to carry out the attack.  *Id.*  Redmond was

21  transferred out of Carson Section after this meeting.  *Id.*

22        In the following weeks, Willis, Woodard, Petitioner, and other BGF members had other

23  meetings to prepare for the assault on Burchfield and to attempt to convince members of the Crips,

24  another prison gang, to join in their plans.  *Id.*  The conspirators ultimately decided on a plan in

25  which Petitioner "would obtain a piece of metal from another BFG member, sharpen it, and pass it

26  on to Johnson."  *Id.*  Johnson was to stab Burchfield on the night shift, when it was dark, as

27  Burchfield passed Johnson's cell on the second tier.  *Id.*  Johnson was then to pass the weapon to

28  another BFG member, who would dispose of it.  *Id.*

The California Supreme Court described the murder as follows:

> On June 8, 1985, Sergeant Burchfield started his assigned shift at 11:00 p.m.  He mentioned to the other officers that Carson section seemed especially noisy that night, and he was going to walk the tiers to check on the prisoners.  Officer Rick Lipton was assigned to patrol the gunrail, a separate elevated walkway that paralleled the cell tiers.  Officer Lipton was armed with a rifle and followed roughly in line with Sergeant Burchfield as he walked along the cells.  Because of the darkness, Officer Lipton could only see Sergeant Burchfield from the waist down.  At some point along the first few cells on the second tier, Officer Lipton saw Sergeant Burchfield stop in front of a cell, and then stumble backward against the railing and collapse in the middle of the tier.  Sergeant Burchfield later died of a single chest wound.

*Id.*, 365 P.3d at 872, 62 Cal. 4th at 1029.  Officers testified to the events of the night.  They found pieces of metal and inmate-made weapons upon searching the section, including a weapon that could have inflicted the wound to Sergeant Burchfield and a makeshift spear shaft generally below Johnson's cell.  *Id.*, 365 P.3d at 873, 62 Cal. 4th at 1029.

Willis became the State's key witness because, shortly after the murder, he sent a note to prison officials, claiming that he would share information about the murder in exchange for release from prison.  *Id.*  The prosecution promised Willis that, although they could not arrange for his release, they would notify the parole board of his assistance, grant him immunity for the crimes—including this conspiracy—that he committed in prison, and move him to an out-of-state prison to protect him from retaliation for his cooperation and testimony.  *Id.*, 365 P.3d at 873, 62 Cal. 4th at 1030.  After meeting with an investigator from the prosecutor's office, Willis wrote a note to Petitioner requesting the details of the murder.  *Id.*  Written in code, but in Petitioner's handwriting, the return note discussed that its author had sharpened a piece of metal, did not know whether the weapon used on Burchfield had been destroyed, and was trying to convince the Crips to commit the next attack.  *Id.*  Willis again by note requested Petitioner to send him a report on the Burchfield attack.  *Id.*  He received the "Usalama Report," written in Petitioner's handwriting.  *Id.*  The report "set out the reasons and planning behind" the attack on Burchfield.  *Id.*  It explained that Petitioner and others chose Burchfield because he had been communicating with the AB and bringing them weapons.  *Id.*  Petitioner and others approved the plan and prepared

3

Johnson to make the strike.  *Id.*

Willis also sent a series of notes to Johnson.  *Id.*  Johnson replied and answered questions about the murder, confirming that he stabbed Burchfield with a spear.  *Id.*  He then disassembled the spear and threw both the sharpened metal and spear shaft off the tier.  *Id.*  The note explained that "Askari" had sharpened the metal and "Askari II" had sent the metal to Johnson.  *Id.*, 365 P.3d at 873-74, 62 Cal. 4th at 1030.  Willis testified that both Askari and Askari II referred to Petitioner.  *Id.*, 365 P.3d at 874, 62 Cal. 4th at 1030.

Petitioner attempted to impeach Willis and undermine the credibility of his testimony.  *Id.*, 365 P.3d at 874, 62 Cal. 4th at 1031.  On cross-examination, Petitioner elicited that Willis had committed and ordered several stabbings, distributed illegal drugs, and extorted and sought favors from prison staff, all while in prison.  *Id.*  Willis admitted that he agreed to cooperate with the police and testify at trial because he wanted to be released from prison and even told other inmates that he "would do whatever he had to do to make sure he didn't spend the rest of his life in prison."  *Id.*  Petitioner challenged the legitimacy of the notes Willis had requested from him, and Willis "admitted that BGF notes were sometimes written by several people to obscure the identity of their authors."  *Id.*  Willis also admitted that he made changes to the notes incriminating Petitioner and that he destroyed up to three hundred notes he and other BGF members had authored.  *Id.*  Finally, Petitioner elicited testimony from Willis that he considered himself to be a member of the Crips and that he wanted to get revenge on the BGF for killing one of his friends in Folsom Prison.  *Id.*

Also testifying was Bobby Evans, a former San Quentin prisoner and member of the BGF who was not involved in the conspiracy to murder Burchfield.  *Id.*  He claimed to be "an 'enforcer' on the BGF main central committee."  *Id.*  Sometime in July 1985, Evans was transferred to the San Quentin Adjustment Center, where he claimed to have met Petitioner, Woodard, and Johnson.  *Id.*  Evans testified that Petitioner and each of his co-defendants told him of their respective roles in the conspiracy when they were housed in the Adjustment Center together.  *Id.*

At trial Petitioner attempted to undermine Evans's credibility.  He cross-examined Evans on his extensive criminal record and illegal actions in prison, which included stabbing inmates.

*Id.*, 365 P.3d at 874, 62 Cal. 4th at 1032.  Petitioner also questioned Evans about his motives for testifying and what consideration he had been given for his testimony.  *Id.*  Evans admitted that he was hoping to be protected from retaliation and to have his sentencing for his current conviction delayed.  *Id.*, 365 P.3d at 874, 894-96, 62 Cal. 4th at 1032, 1064-66.

Although the prosecution presented the evidence against each of the co-defendants in one trial, Petitioner and Woodard had one jury, and Johnson was tried by a second jury.  *Id.*, 365 P.3d at 871, 62 Cal. 4th at 1027.  The juries found all the co-defendants guilty.  The Masters and Woodard jury heard penalty-phase evidence for Woodard first but was unable to reach a unanimous verdict on punishment.  *Id.*

During Petitioner's penalty phase, the prosecution presented evidence of Petitioner's criminal history, as both a juvenile and adult.  *Id.*, 365 P.3d at 875, 62 Cal. 4th at 1033.  Petitioner first interacted with the police when he was twelve years old and engaged in multiple thefts and violent incidents using weapons throughout his teen years.  *Id.*  While a ward of the California Youth Authority, Petitioner assaulted other wards.  *Id.*, 365 P.3d at 875, 62 Cal. 4th at 1033-34. Petitioner was first prosecuted as an adult for robbing a gas station when he was seventeen years old.  *Id.*, 365 P.3d at 875-76, 62 Cal. 4th at 1034.  After he turned eighteen, Petitioner committed several robberies in the Los Angeles area, using a handgun each time.  *Id.*, 365 P.3d at 876, 62 Cal. 4th at 1034.  Petitioner admitted to police that during this string of robberies, he had shot at the officers responding to a gas station and that he had been involved in a robbery of a liquor store, during which the owner of the store was shot and killed.  *Id.*  The prosecution also introduced evidence of the twelve counts of robbery, some with use of a firearm, that resulted in the twenty-year sentence Petitioner was serving when Sergeant Burchfield was killed.  *Id.*, 365 P.3d at 876, 62 Cal. 4th at 1035.  Additionally, the prosecution offered evidence of Petitioner's in-prison infractions, which included possession and manufacture of weapons, assaults on inmates and officers, and an attempted escape during the Burchfield trial.  *Id.*, 365 P.3d at 876-77, 62 Cal. 4th at 1035-36.

Following the close of the prosecution's evidence in aggravation, Petitioner presented his case in mitigation.  The California Supreme Court summarized the presentation as follows:

1

2

3

4

5

> To establish lingering doubt, [Petitioner] sought to further undermine the credibility of Bobby Evans's testimony that [Petitioner] had admitted his role in Sergeant Burchfield's murder. [Petitioner] also challenged the evidence tying [Petitioner] to the Hamil and Jackson murders, and disputed the significance of the other unadjudicated violent criminal activity. Further, the defense recounted [Petitioner]'s social history of neglect, abuse, crime, and violence; described prison conditions and the effect they had on prisoners; and discussed [Petitioner]'s ability to be lawful and productive if sentenced to life imprisonment.

6

7    *Id.*, 365 P.3d at 877, 62 Cal. 4th at 1036. The jury weighed this evidence against that presented in

8    aggravation.

9          At the close of the penalty phase, the jury reached a verdict of death as to Petitioner. *Id.*,

10   365 P.3d at 871, 62 Cal. 4th at 1027. Subsequently, the prosecution chose not to retry Woodard's

11   penalty phase, resulting in a sentence of life imprisonment without parole. *Id.* The Johnson jury

12   unanimously reached a death verdict, but the trial court granted Johnson's automatic motion for

13   modification and sentenced Johnson to life imprisonment without parole. *Id.*

14   **II.    PROCEDURAL HISTORY**

15         A.    Petitioner's Direct Appeal

16         Following his conviction and sentence, Petitioner filed a direct appeal before the California

17   Supreme Court. Dkt. No. 1 at 13. Petitioner claimed, in relevant part, that he was denied a fair

18   opportunity to present his defense when the trial court excluded the confessions of Harold

19   Richardson and Charles Drume, that the State failed to disclose evidence of witness Bobby

20   Evans's extensive history as an informant, that the preliminary hearing should have included a

21   line-up because of Rufus Willis's inconsistent identification of Petitioner, that Petitioner should

22   have been allowed to question Willis about Richardson's identity, and that Petitioner's trial should

23   have been severed from that of Woodard, among numerous other alleged trial errors. *Id.* The

24   California Supreme Court affirmed the verdict and sentence on February 22, 2016. *Id.*; *Masters*,

25   365 P.3d at 871, 62 Cal. 4th at 1026.

26         In his direct appeal, Petitioner made claims related to all phases of his trial (pretrial, guilt,

27   and penalty). The court ruled that none of the following claims had merit.

28

i.   Denial of Pre-Testimony Lineup and Questioning

During the preliminary hearing, Petitioner's counsel argued that the description of Petitioner testified to by the prosecution's lead witness, Rufus Willis, was not accurate. *Masters*, 365 P.3d at 882, 62 Cal. 4th at 1044. Petitioner's counsel then requested a lineup at which Willis could attempt to identify Petitioner. *Id.*, 365 P.3d at 882, 62 Cal. 4th at 1045. Instead of allowing the lineup, the preliminary hearing court returned all the defendants to the courtroom and had them sit in seats not near their respective attorneys. *Id.* Willis was able to identify each, including Petitioner, in this manner. *Id.*

The California Supreme Court denied Petitioner's claim. First, the court ruled that Petitioner failed to establish a reasonable likelihood that Willis would have misidentified him, in part because evidence established that Willis and Petitioner knew each other from being confined in the same section at San Quentin and attending multiple meetings together. *Id.*, 365 P.3d at 882-83, 62 Cal. 4th at 1046. Next, the court found no prejudice to Petitioner because at trial his counsel had the opportunity to challenge the weaknesses in Willis' identifications, and Willis nonetheless identified Petitioner as one of his co-conspirators. *Id.*, 365 P.3d at 883, 62 Cal. 4th at 1047. Finally, the court found that even if the magistrate erred in denying the lineup request, Petitioner was not prejudiced because the rulings "did not deny [him] a reasonable opportunity to challenge Willis' identification of him or otherwise deprive him of a fair trial." *Id.*, 365 P.3d at 884, 62 Cal. 4th at 1048.

ii.   Denial of Motion to Sever

Before trial began, Petitioner moved to sever his case from those of Woodard and Johnson. *Id.* Petitioner intended to introduce statements from Richardson and Drume, which implicated both of his co-defendants but did not mention him, and argued that severance was required. *Id.* The trial court denied this motion. *Id.*

The California Supreme Court found no error in the trial court's decision not to grant the motion for severance. *Id.*, 365 P.3d at 885, 62 Cal. 4th at 1049. Because the trial court found, and the Supreme Court agreed, that the Richardson and Drume statements were not admissible because they were not reliable, they created no danger of conflicting defenses among the co-defendants.

1    *Id.* The court thus properly denied the motion to sever the trial as Petitioner requested.  *Id.*

2              iii.    Denial of Immunity for Witnesses

3         To secure the testimony of alleged co-conspirator Richardson, Petitioner asked the

4    preliminary-hearing court to grant Richardson immunity from prosecution for the Burchfield

5    murder.  *Id.*, 365 P.3d at 885, 62 Cal. 4th at 1049-50.  During a hearing on this request, the

6    prosecutor testified that he had not offered immunity to Richardson because Richardson would not

7    allow his statement to be tape-recorded, and that the prosecution had granted immunity to Willis

8    because Willis's "statements were corroborated by other evidence."  *Id.*, 365 P.3d at 885, 62 Cal.

9    4th at 1050.  In response to questions from the defense that went "beyond the scope of the

10   hearing," the magistrate judge vacated his decision to hold an evidentiary hearing, struck the

11   prosecutor's testimony, and denied Petitioner's request for immunity for Richardson.  *Id.*  During

12   trial, Petitioner requested immunity from the court for Richardson when he invoked his Fifth-

13   Amendment privilege against self-incrimination.  *Id.*  The trial court declined to grant judicial

14   immunity.  *Id.*

15        The Supreme Court ruled that the trial and preliminary hearing courts did not err in

16   declining to grant Richardson immunity.  *Id.*, 365 P.3d at 886, 62 Cal. 4th at 1051.  The court

17   considered the doctrine of "judicial use immunity," under which a court may have the authority to

18   grant immunity to a witness if failing to do so would prevent the defendant "from presenting

19   exculpatory evidence which is crucial to [the defendant's] case."  *Id.* (quoting *Government of

20   Virgin Islands v. Smith*, 615 F.2d 964, 969 (3d Cir. 1980)).  It then noted the Third Circuit's later

21   partial abrogation of *Smith* on the ground that judicially granted immunity "impermissibly

22   interfered with the executive branch's prosecutorial discretion." *Id.* (citing *United States v. Quinn*,

23   728 F.3d 243, 251-57 (3d Cir. 2013) (*en banc*)).  Accordingly, the court held that "California

24   courts have no authority to confer use immunity on witnesses" and denied Petitioner's claim.  *Id.*

25   The court additionally ruled that the prosecutor did not commit misconduct by refusing to grant

26   immunity to Richardson because his statements did not clearly exculpate Petitioner, there was

27   other evidence of Petitioner's guilt, and there was no showing that the prosecutor intended to

28

1  distort the factfinding process by declining to grant immunity. *Id.*, 365 P.3d at 886-87, 62 Cal. 4th

2  at 1052-53.

3          iv.      Exclusion of the Statements of Richardson and Drume

4          Petitioner attempted to secure the testimony of both Richardson and Drume, San Quentin

5  inmates who gave statements that he contended implied that he was not involved in planning the

6  attack and would have bolstered his theory that Willis misidentified him as a participant in the

7  conspiracy. *Id.*, 365 P.3d at 887, 62 Cal. 4th at 1054.  But both inmates declined to testify.  *Id.*,

8  365 P.3d at 887-891, 62 Cal. 4th at 1054-58.  In place of live testimony, Petitioner sought to

9  introduce the contents of statements both alleged co-conspirators had made to law enforcement.

10  *Id.* The trial court excluded the statements as insufficiently reliable to overcome the hearsay

11  prohibition.  *Id.*

12          Harold Richardson was an inmate at San Quentin and a member of the BGF.  *Id.*, 365 P.3d

13  at 887-88, 62 Cal. 4th at 1054.  A little over a year after Burchfield's murder, he decided to

14  disassociate from the BGF and went through a series of interviews with prison officials so that

15  they would no longer classify him as a member of the gang.  *Id.*  The officials told Richardson that

16  he was "not under" *Miranda v. Arizona*, 384 U.S. 436 (1966), during the interviews, and they

17  represented that they would do everything possible to keep the information confidential and keep

18  Richardson safe.  *Id.*, 365 P.3d at 888, 62 Cal. 4th at 1054.  Richardson provided the following

19  information:

20
21                  Richardson said he was a lieutenant in the BGF and knew all the
                details about Sergeant Burchfield's murder.  Richardson claimed the
22                  murder was planned on the exercise yard by Johnson, Woodard,
                Willis, and himself.  According to Richardson, the initial plan called
23                  for him to stab Sergeant Burchfield and for Johnson to be armed with
                a makeshift gun.  Johnson was afraid to use the gun, so he and
24                  Richardson were to switch weapons.  The plan to use a gun was
                abandoned because prison authorities had confiscated the BGF's
25                  gunpowder.  Richardson said he helped make knives for the BGF,
                including the one that was used to stab Sergeant Burchfield.

26  *Id.*  After the court ordered the prison to disclose a redacted version of the statement to the

27  defendants and informed Richardson that the statement could be used against him in criminal

28

United States District Court
Northern District of California

9

1   proceedings, Richardson sent an additional letter to one of his original interviewers. *Id.*, 365 P.3d

2   at 888, 62 Cal. 4th at 1054-55. In that letter, he clarified the plan the conspirators had made to kill

3   Burchfield. *Id.*, 365 P.3d at 888, 62 Cal. 4th at 1055. When called to testify during the

4   preliminary hearing, Richardson invoked his privilege against self-incrimination. *Id.*

5          Petitioner sought to introduce Richardson's statements to the prison officials at trial, but

6   the court excluded them as inadmissible hearsay and ruled that they were not against Richardson's

7   penal interest and therefore not subject to that hearsay exception. *Id.* The Supreme Court found

8   the trial court's determination that the statements were not against Richardson's penal interest to

9   be "questionable." *Id.*, 365 P.3d at 889, 62 Cal. 4th at 1056. Nonetheless, the court held that the

10  trial court properly excluded them because "they were insufficiently trustworthy and therefore

11  unreliable." *Id.*, 365 P.3d at 889, 62 Cal. 4th at 1057. In support of this conclusion, the court

12  pointed to "the significant passage of time" between the murder and Richardson's statement,

13  explaining that his statements over a year after the crime, and after charges had been filed in the

14  case, "did not necessarily show his personal knowledge of the crime, as he had ample opportunity

15  to learn of the details from other inmates." *Id.*, 365 P.3d at 889-90, 62 Cal. 4th at 1057.

16         Around thirty months after the Burchfield murder, inmate Charles Drume wrote a letter to

17  the Marin County Clerk in which he claimed to have information about the murder of a sergeant at

18  San Quentin. *Id.*, 365 P.3d at 890, 62 Cal. 4th at 1058. Drume's statements to law enforcement

19  asserted that he was the BGF head of security in Carson Section at the time of Burchfield's

20  murder, he planned the murder with Woodard and two other BGF members, and he made the

21  weapon used to kill Burchfield. *Id.* The trial court denied Petitioner's attempt to introduce the

22  statements at trial, finding them unreliable and inadmissible as hearsay. *Id.* On direct appeal, the

23  Supreme Court found that the trial court did not abuse its discretion in finding that the statements

24  "lacked sufficient trustworthiness." *Id.*, 365 P.3d at 891, 62 Cal. 4th at 1058.

25              v.    Exclusion of Defense Expert Testimony

26         Petitioner claimed that the trial court abused its discretion by excluding the testimony of an

27  expert witness familiar with prison culture. *Id.*, 365 P.3d at 891, 62 Cal. 4th at 1059. The expert,

28

United States District Court
Northern District of California

Dr. John Irwin, a sociologist, would have testified that "prisoners often create elaborate fantasies and embellish their accomplishments, . . . often falsely claim to have committed criminal acts[,] and often provide to the authorities information about criminal acts committed by others in exchange for some sort of benefit." *Id.*  The Supreme Court concluded that the trial court did not abuse its discretion by excluding the offered testimony as irrelevant, because Petitioner "failed to link Dr. Irwin's proffered testimony to any of the defendants." *Id.*

> vi.     Exclusion of Evidence of Another Prison Gang's Alleged Involvement

Petitioner attempted to introduce evidence, including testimony regarding anonymous notes and testimony about the circumstances surrounding the death of an inmate, to suggest that the Crips murdered Burchfield. *Id.*, 365 P.3d at 892, 62 Cal. 4th at 1061.  The Supreme Court ruled that the trial court did not abuse its discretion in excluding testimony regarding several anonymous notes that claimed responsibility for the murder because the notes were inadmissible as hearsay and did not have sufficient indicia of reliability to qualify for an exception to the hearsay rule. *Id.*  Similarly, the court found that even if it assumed the trial court erred in sustaining relevance and foundation objections to questions the defense sought to pose to a correctional officer regarding the death of a Crips member, Petitioner could not show prejudice in light of the other evidence presented. *Id.*, 365 P.3d at 893, 62 Cal. 4th at 1062.

> vii.    Admission of Evidence of BGF Philosophy

Arguing that its prejudicial effect outweighed its probative value, Petitioner unsuccessfully sought to have the trial court exclude evidence related to "the BGF's membership, organization, customs, and practices." *Id.*  After reviewing each of the challenged categories of documents, the Supreme Court found that the trial court did not abuse its discretion in admitting the documents because "they were directly related to the legal issues raised in [Petitioner's] trial and did not tend to evoke an emotional bias against him." *Id.*, 365 P.3d at 893, 62 Cal. 4th at 1063.  Documents related to the revolutionary philosophy of the gang, if believed, "tended to prove the intent and motive of [the conspirators]." *Id.*  The court concluded that exclusion of the evidence would not have produced a more favorable outcome for Petitioner because of the other evidence that

United States District Court
Northern District of California

1   established his guilt.  *Id.*, 365 P.3d at 894, 62 Cal. 4th at 1064.

2                viii.    *Brady* Claims Related to Evans

3          Petitioner claimed that the prosecution withheld evidence of promises made to Bobby

4   Evans in exchange for his testimony.  *Id.*  Evans testified that he made a deal to plead guilty to

5   attempted robbery in Alameda County in exchange for a sentence of no more than sixteen months,

6   including a concurrent year for a parole violation.  *Id.*  After making this deal, Evans contacted

7   Agent Hahn to disclose information about the Burchfield murder in exchange for protection from

8   the BGF.  *Id.*, 365 P.3d at 894-95, 62 Cal. 4th at 1064-65.  Evans also testified that he planned to

9   keep the time he had to serve in state prison as short as possible by remaining in local custody.

10  *Id.*, 365 P.3d at 895, 62 Cal. 4th at 1065.  During jury deliberations, Petitioner learned that Evans

11  had been granted probation at his sentencing hearing, which Hahn and personnel from the

12  prosecutor's office had taken steps to postpone.  *Id.*, 365 P.3d at 895, 62 Cal. 4th at 1065-66.

13  Although Evans remained in local jail because of his parole violation, Agent Hahn requested that

14  he be released, and the sentencing judge released him to Hahn's custody.  *Id.*, 365 P.3d at 895, 62

15  Cal. 4th at 1066.

16         The state supreme court examined the trial court's treatment of this evidence under the

17  two-pronged test from *Brady v. Maryland*, 373 U.S. 83 (1963).  *Id.*, 365 P.3d at 896, 62 Cal. 4th at

18  1067.  The court recognized that Petitioner did not know prior to trial about the full extent of the

19  promises and efforts made by Hahn or about the early release.  *Id.*, 365 P.3d at 897, 62 Cal. 4th at

20  1068.  The court concluded, however, that the undisclosed evidence was not material under *Brady*

21  because there was not a reasonable probability of a different result had it been disclosed.  *Id.*  In

22  support of this conclusion, the court pointed to the testimony that Evans expected that his safety

23  would be taken care of and that he hoped for "a favor" in exchange for offering information about

24  the BGF.  *Id.*  In addition, the court noted the thorough attack on Evans's credibility during cross-

25  examination and the fact that his shortened time in jail was consistent with the "*no more than* 16

26  months" he testified that he expected to receive as a sentence based on his plea bargain.  *Id.*

27  (emphasis in original).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

ix.     Recess During Jury's Deliberations

Petitioner's final guilt-phase claim alleged that the trial court "erred by adjourning for nine court days during the winter holidays" in the middle of guilt-phase deliberations.  *Id.*, 365 P.3d at 898, 62 Cal. 4th at 1070-71.  The Supreme Court determined that Petitioner forfeited this claim and that it had no merit.  *Id.*, 365 P.3d at 898, 62 Cal. 4th at 1071.

x.      Penalty Phase Claims

In his direct appeal, Petitioner presented several claims of error during the penalty phase of his trial, including denial of motion for new jury or to reopen *voir dire*; improper admission of evidence regarding unadjudicated offences; improper admission of photographs of victim of uncharged killing; and improper time limits imposed on arguments to jury.  *Id.*, 365 P.3d at 898-902, 62 Cal. 4th at 1070-76.  Because he raises none of those issues in the pending petition, the Court will not address the California court's denial of these claims or of Petitioner's challenge to the constitutionality of the state's capital sentencing statutes.

B.      State Habeas Corpus Proceedings

While his appeal was pending with the state supreme court, Petitioner filed a petition for a writ of habeas corpus in the same court on January 7, 2005.  Dkt. No. 1 at 14.  In support of the petition, Petitioner submitted sworn statements from multiple people either recanting testimony or stating that Petitioner was not involved in the conspiracy to murder Burchfield.  Specifically, (1) Willis recanted his testimony against Petitioner in a sworn statement; (2) in a sworn statement, Woodard admitted his role in the conspiracy and stated that Petitioner was not involved; (3) Johnson also admitted in a sworn statement that he killed Burchfield and that Petitioner was not involved; (4) Petitioner presented evidence that Evans had recanted his trial testimony regarding Petitioner; and (5) Drume, in a sworn statement, claimed to have sharpened the weapon used against Burchfield.  *Id.*  Petitioner also presented additional evidence in support of his argument that the State used false evidence against him at trial.  *Id.*

In its initial review of the habeas petition, the California Supreme Court found that Petitioner had presented a *prima facie* case for relief as to some of his claims, particularly those

13

alleging the presentation of material false evidence, the withholding of material evidence,

improper actions by the prosecution, and discovery of new material evidence. *In re Masters*, 446

P.3d at 243, 7 Cal. 5th at 1060.  The court thus ordered the Director of Corrections and

Rehabilitation to show cause why relief should not be granted because:

> (1) material false evidence was admitted at the guilt phase of his trial; (2) newly discovered evidence casts fundamental doubt on the prosecution's guilt-phase case; (3) [Petitioner]'s trial was fundamentally unfair because prosecution witness [Willis's] testimony was unreliable due to improper coercion by the prosecution; (4) the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 215[,] by failing to disclose the promises of leniency to prosecution witness Bobby Evans and other facts bearing on [Evans's] credibility that have come to light after the judgment was imposed; (5) the prosecution knowingly presented the false testimony of Bobby Evans; (6) [Petitioner]'s trial was fundamentally unfair because [Evans's] testimony was unreliable due to improper coercion by the prosecution; (7) material false evidence—the testimony of [prosecution witness] Hoze—was admitted at the penalty phase regarding [Petitioner's] participation in the murder of David Jackson; and (8) newly discovered evidence regarding Hoze's testimony casts fundamental doubt on the accuracy and reliability of the penalty-phase proceedings.

*Id.*, 446 P.3d at 243, 7 Cal. 5th at 1060-61.  The court then appointed a special referee to hold an

evidentiary hearing so that both sides could introduce evidence to address the habeas claims raised

by Petitioner.  *Id.*, 446 P.3d at 243, 7 Cal. 5th at 1061.

The referee's role was to answer a series of factual questions to aid the court in

determining the merits of the petition.  Several witnesses testified at the reference hearing,

including BGF members, a prosecutor, many law enforcement officials, two experts, Petitioner's

counsel, and Petitioner's investigators. *Id.*  Statements of other BGF members were introduced in

evidence at the hearing. *Id.*

The hearing included evidence regarding Bobby Evans that had not been adduced at trial.

*Id.*, 446 P.3d at 252, 7 Cal. 5th at 1074-75.  Agent Hahn explained that his job for the Department

of Corrections involved identifying and tracking gang members, including parolees. *Id.*, 446 P.3d

at 243, 7 Cal. 5th at 1062.  Evans was among the gang members Hahn tracked, and prior to

Petitioner's trial, "Evans had provided Hahn with information on multiple occasions, but most of

it was of little value." *Id.*, 446, P.3d at 243-44, 7 Cal. 5th at 1062.  Hahn referred Evans to other

14

1   law enforcement agencies as a paid informant.  *Id.*, 446 P.3d at 244, 7 Cal. 5th at 1062.  Hahn

2   considered Evans "a 'professional liar,' as he had provided inaccurate information on multiple

3   occasions."  *Id.*  According to Hahn, Evans contacted him with information about Burchfield's

4   murder.  *Id.*  Hahn testified that he made no offer to Evans for his testimony other than to "help

5   keep him secure," and said that he wrote to the parole board in Texas and urged it to end Evans's

6   parole, explaining how he had assisted law enforcement.  *Id.*  Hahn testified that he took this step

7   so that Evans would be eligible to enter the witness protection program.  *Id.*

8          David Gasser, who was the investigator for the prosecution in Petitioner's case,

9   acknowledged that he and Hahn "were in regular contact" during the investigation of Burchfield's

10  murder.  *Id.*  Deputy District Attorney Berberian testified that he did not make any threats or

11  promises to Evans and that his office did not direct Hahn in his dealings with Evans.  *Id.*  Two

12  former San Francisco police officers testified that Evans had been a possible suspect in the 1988

13  killing of James Beasley, but that they never contacted him.  *Id.*, 446 P.3d at 243, 7 Cal. 5th at

14  1061.  The former officers denied "forgoing investigating Evans in exchange for his testimony at

15  [Petitioner's] trial."  *Id.*  An Oakland police officer testified that he told Hahn that Evans was a

16  suspect in the Beasley killing.  *Id.* 446 P.3d at 244, 7 Cal. 5th at 1062.

17         Evans himself testified in a deposition that was overseen by the referee prior to the

18  evidentiary hearing because of Evans's health.  *Id.*  During the deposition, Evans testified that "he

19  had worked regularly as a paid informant for various law enforcement agencies and had previously

20  provided information to Hahn."  *Id.*, 446 P.3d at 244, 7 Cal. 5th at 1063.  Evans "admitted that

21  some of the evidence he had provided to Hahn was false."  *Id.*  He "stated that he had never

22  spoken to [Petitioner and] . . . did not know if [Petitioner] was involved in Burchfield's murder."

23  *Id.*, 446 P.3d at 244, 7 Cal. 5th at 1062.  He acknowledged that "he had testified to the contrary" at

24  trial.  *Id.*  Further:

25             Evans said that Hahn and Gasser supplied him with information about
              Burchfield's murder in order for him to implicate [Petitioner].  Evans
26            said Hahn and Gasser assured him that he would receive a sentence
              of less than [a] year on his own pending charges in Alameda County
27            if he testified against [Petitioner].  Evans also said that Hahn, prior to
              [Petitioner]'s trial, had told him to underplay his informant work so
28            that he could later resume his work as an informant.

> Evans said that he changed his mind about testifying at [Petitioner]'s trial, but then Hahn, Hahn's partner, and Gasser threatened Evans with prosecution in numerous cases—including Burchfield's murder—if he did not implicate [Petitioner]. Evans also testified that the Alameda County District Attorney had threatened to charge him under a recidivist statute, with a possible prison sentence of 18 years, if he did not cooperate.

*Id.*, 446 P.3d at 244, 7 Cal. 5th at 1063.

An expert on the California prison system testified that his review of San Quentin's records showed that Petitioner had been moved to the Adjustment Center in December 1985, several months after Evans had claimed at trial that he had spoken to Petitioner in the Adjustment Center. *Id.*, 446 P.3d at 244-45, 7 Cal. 5th at 1063.

Rufus Willis invoked his privilege against self-incrimination at the evidentiary hearing, and, although he later stated that he would testify, Petitioner did not call him as a witness and instead offered into evidence multiple prior statements made by Willis. *Id.*, 446 P.3d at 245, 7 Cal. 5th at 1063. In a sworn statement from 2001, Willis declared that: (1) Petitioner "played no role in the attack on Burchfield;" (2) Petitioner did not author the two notes that were admitted against him at trial, but he did copy them; and (3) he told Deputy District Attorney Berberian that he did not want to testify at trial, but Berberian told him he would be immediately returned to San Quentin if he did not, "which Willis interpreted as a death threat." *Id.*, 446 P.3d at 245, 7 Cal. 5th at 1063-64 (internal quotation marks omitted). In a statement from 2002, however, Willis declared that he did not lie at trial, and in 2010, he told representatives of the Attorney General some things about his involvement in the murder conspiracy that were consistent with his trial testimony. *Id.*, 446 P.3d at 245, 7 Cal. 5th at 1064. With respect to Willis's statement that Petitioner had not authored the two inculpating notes, a linguistics expert opined that it was more likely than not that the two notes introduced at trial were not authored by the same person who had authored fourteen other documents identified as written by Petitioner. *Id.*

Petitioner's co-defendant Woodard also testified at the evidentiary hearing regarding the genesis of the conspiracy to attack Sergeant Burchfield. *Id.* He explained that "in April or May 1985, prior to [Woodard's] assuming command of the Carson section, Willis had suggested that the BGF attack other gangs." *Id.* Woodard's predecessor and Willis then determined that they

should attack Burchfield instead. *Id.* Petitioner was at the meeting, but he disagreed with the plan. *Id.* "Woodard testified that after he had assumed command, he relieved [Petitioner] of his responsibilities in the BGF due to [Petitioner]'s disagreement with the plan to attack Burchfield." *Id.* Woodard also testified that Petitioner was not good at making weapons. *Id.* Finally, Woodard testified that "he ordered [Petitioner] and their codefendant Andre Johnson to neither discuss the case nor testify at trial." *Id.* Woodard said that he threatened to kill Petitioner if he said anything about the case. *Id.*

BGF member Michael Rhinehart testified at the evidentiary hearing. *Id.* Rhinehart testified that he learned of the plan to attack a prison guard from Woodard, Willis, and Harold Richardson. *Id.* He testified that his role in the conspiracy was limited to passing notes. *Id.* He testified that Petitioner opposed the plan to attack a guard, Woodard became angry with Petitioner, and Petitioner did not participate in the murder or conspiracy at all. *Id.* Rhinehart also testified that he told Bobby Evans the details of the murder. *Id.*

Finally, Welvie Johnson testified that he was third-in-command of the San Quentin BGF and was part of the process that could authorize BGF attacks. *Id.*, 446 P.3d at 245, 7 Cal. 5th at 1065. According to Johnson, BGF leadership did not approve the attack on Burchfield. *Id.* Johnson testified that he did not know Petitioner before the murder and that the gang investigated the attack, but he learned of no evidence that Petitioner was involved. *Id.*, 446 P.3d at 246, 7 Cal. 5th at 1065. Johnson testified that it would have been a breach of BGF protocol to pass a weapon between tiers. *Id.*

Petitioner also submitted the reports of correctional officers who had interviewed Harold Richardson in 1986, when he implicated himself in the attack but did not mention Petitioner. *Id.* The referee received these reports as well as the letters Richardson had written to the officers, but Richardson did not testify at the evidentiary hearing. *Id.*

The referee made several relevant evidentiary findings. Initially, the referee found "that it was likely that some false testimony was offered at [Petitioner's] trial." *Id.* The referee "specifically found that the prosecution's key witnesses, Willis and Evans, had recanted their trial testimony." *Id.* The referee characterized Willis and Evans as "'liars with highly unreliable and

17

selective memories[,] . . . utterly lacking in credibility.'"  *Id.* (quoting Referee's Report).  The

referee further characterized the witnesses: "Both are career criminals whose word, under oath or

otherwise, means nothing.  Both are well-known snitches.  Both would say anything to save their

own hide—and both have so admitted.  Both are manipulative and unreliable."  *Id.*  The referee

characterized the testimony of all the BGF members as often "contradictory": "[f]or example,

there was no clear agreement among the witnesses as to who was in charge, who ordered and

organized Burchfield's killing, why the killing was ordered, who made the weapon, who stabbed

Burchfield, and whether there was a backup plan."  *Id.*, 446 P.3d at 246, 7 Cal. 5th at 1066.  The

referee found that "every BGF member who testified at the reference hearing had lied during

[Petitioner's] trial, this proceeding, or both."  *Id.*  The referee concluded that all members of the

BGF "have a motive now to give testimony favorable to [Petitioner]."  *Id.*

Relying on, but not bound by, the referee's findings of fact, the Supreme Court discharged

the order to show cause and denied the petition.  *Id.*, 446 P.3d at 241, 7 Cal. 5th at 1058.  The

court had asked the referee for answers to a series of questions to guide it in its decision-making.

*Id.*, 446 P.3d at 243, 7 Cal. 5th at 1061.  In evaluating the answers to those questions, the court

found that "'deference to the referee [was] particularly appropriate on issues requiring resolution

of testimonial conflicts and assessment of witnesses' credibility.'"  *Id.*, 446 P.3d at 247, 7 Cal. 5th

at 1066 (quoting *In re Cowan*, 419 P.3d 535, 542, 5 Cal. 5th 235, 245 (2018)).

C.   <u>Question One: "Was false evidence regarding [Petitioner's] role in the
charged offenses admitted at the guilt phase of [his] trial?  If so, what was that
evidence?"</u>  (*Id.*, 446 P.3d at 247, 7 Cal. 5th at 1066).

Regarding false evidence, the referee focused on the testimony of Willis and Evans.

Although the referee believed that it was likely that some false evidence had been adduced at trial,

the Supreme Court agreed that there was no sound basis to challenge the jury's determination of

Willis's credibility or to credit Willis's recantation of his trial testimony.  *Id.*, 446 P.3d at 246-48,

7 Cal 5th at 1065-69.  The court cited the principle that "[i]t has long been recognized that the

offer of a witness, after trial, to retract his or her sworn testimony is to be viewed with suspicion."

*Id.*, 446 P.3d at 247, 7 Cal 5th at 1067.  Regarding the two notes the prosecution introduced

against Petitioner, the Supreme Court agreed with the referee's acceptance of the linguistic expert's opinion "that it was more likely than not these two documents were not authored by the same person who authored the other 14 documents offered at the reference hearing." *Id.*, 446 P.3d at 247, 7 Cal. 5th at 1067-68. Nonetheless, the court concluded that "whether [Petitioner] wrote the two notes in his own words or the words of another did not exonerate him from the conspiracy to attack Burchfield." *Id.* 446 P.3d at 247, 7 Cal. 5th at 1068.

Similarly, the court accepted the referee's finding, based on her observation of Evans's demeanor, that his recantation of his trial testimony concerning Petitioner was "wholly incredible." *Id.*, 446 P.3d at 248, 7 Cal. 5th at 1068. The court did agree with the referee that Evans lied during trial about his relationship and number of contacts as an informant for Hahn. *Id.* The court found that "[t]his finding . . . goes to Evans's general credibility, which defense counsel vigorously attacked at trial." *Id.* Additionally, the court accepted the evidence that, although Evans testified that he discussed the Burchfield murder with Petitioner in the Adjustment Center in September 1985, Petitioner was not transferred to the Adjustment Center until December 1985. *Id.* The court concluded that "even if Evans's testimony about the timing of the conversation was false, this does not necessarily mean his testimony about the content of the conversation was false." *Id.*

The court also accepted the referee's conclusions regarding the credibility of Petitioner's co-defendants and other BGF members. *Id.*, 446 P.3d at 248, 7 Cal. 5th at 1068-69. The court referenced its earlier finding that the trial court did not abuse its discretion when it excluded Harold Richardson's testimony as unreliable hearsay. *Id.*, 446 P.3d at 248, 7 Cal. 5th at 1069.

Overall, the court "accept[ed] the referee's findings with respect to the first question because they [we]re supported by substantial evidence." *Id.*

> D.   Question Two: "Is there newly discovered, credible evidence indicative of [Petitioner's] not having been a participant in the charged offenses?  If so, what is that evidence?" (*Id.*, 446 P.3d at 248, 7 Cal. 5th at 1069).

The Supreme Court agreed with the referee that Petitioner had not demonstrated that he had newly discovered, credible evidence of his innocence. *Id.*, 446 P.3d at 249-51, 7 Cal. 5th at

United States District Court
Northern District of California

1069-73.  California law defines "newly discovered, credible evidence" as "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." CAL. PENAL CODE § 1473(b)(3)(B) (2016).  Petitioner claimed as new (1) the testimony from BGF members that it would have been less dangerous to fabricate the murder weapon on the same tier where it was used, as opposed to on the tier where Petitioner was housed; (2) the opinion from the linguistics expert that Petitioner likely did not author the incriminating notes, and (3) the statements from Willis and Evans that he did not participate in the conspiracy.  *Masters*, 446 P.3d at 249-50, 7 Cal. 5th at 1071-72.  After considering exceptions to these findings from both sides, the Supreme Court concluded that none of the claimed new evidence, including the testimony regarding the weapon's fabrication, would have entitled Petitioner to relief because "the evidence at the reference hearing amounted only to speculation pointing in many different directions." *Id.*, 446 P.3d at 250, 7 Cal. 5th at 1072.  Accordingly, the court "accept[ed] the referee's ultimate finding that [Petitioner] has not provided new, credible evidence that someone else fabricated the weapon used to stab Burchfield." *Id.*

> E.   Question Three: "What, if any, promises or threats were made to guilt[-]phase prosecution witness Rufus Willis by District Attorney Investigator Charles Numark or Deputy District Attorneys Edward Berberian or Paula Kamena? Was Willis's trial testimony affected by any such promises or threats, and, if so, how?"  (*Id.*, 446 P.3d at 251, 7 Cal. 5th at 1073).

The Supreme Court found that substantial evidence supported the referee's finding that Numark, Berberian, and Kamena made no undisclosed promises or threats to induce Willis to testify.  *Id.*, 446 P.3d at 252, 7 Cal. 5th at 1074.  The court credited the referee's conclusion that Willis was "manipulative and untrustworthy" and that his post-trial statements regarding promises and threats lacked credibility.  *Id.*, 446 P.3d at 251, 7 Cal. 5th at 1073.  Inadmissible hearsay was insufficient to support Petitioner's claims that there were threats and promises unknown to the jury. *Id.*, 446 P.3d at 251, 7 Cal. 5th at 1074.

United States District Court
Northern District of California

20

F.   Question Four: "Were there promises, threats or facts concerning guilt[-]phase prosecution witness Bobby Evans's relationship with law enforcement agencies of which Deputy District Attorneys Berberian and Kamena were, or should have been, aware, but that were not disclosed to the defense?  If so, what are those promises, threats or facts?"  (*Id.*, 446 P.3d at 252, 7 Cal. 5th at 1074).

The Supreme Court accepted the referee's answer to Question Four.  The referee found that, although "Evans had more extensive contacts with Hahn than were disclosed at trial," Berberian and Kamena "did not know about these contacts."  *Id.*  Petitioner did not dispute the conclusion that the deputy district attorneys were unaware of the extent of Evans's work as an informant for Hahn.  *Id.*, 446 P.3d at 252, 7 Cal. 5th at 1075.  The court said it would separately address Petitioner's claims regarding facts that could be imputed to Berberian and Kamena.  *Id.*

G.   Question Five: "Did Deputy District Attorneys Berberian and Kamena knowingly present false testimony by Bobby Evans?  If so, what was that testimony?"  (*Id.*, 446 P.3d at 252, 7 Cal. 5th at 1075).

The court accepted the referee's finding that the deputy district attorneys did not knowingly present false testimony by Evans, noting that "[a]t the reference hearing, [Petitioner] conceded there was no evidence to support this contention."  *Id.*

H.   Question Six: "What, if any, promises or threats were made to Bobby Evans by District Attorney Investigator Numark, Department of Corrections Investigator James Hahn, or Deputy District Attorneys Berberian and Kamena?  Was Evans's trial testimony affected by any such promises or threats, and, if so, how?"  (*Id.*, 446 P.3d at 252, 7 Cal. 5th at 1075-76).

The referee determined, and Petitioner did not contest, that there was no evidence that Numark, Berberian, or Kamena made any promises or threats to Evans.  *Id.*, 446 P.3d at 253, 7 Cal. 5th at 1076.  Regarding Hahn, the referee found that Evans was "an unbelievable witness" and that Petitioner presented no evidence that Hahn promised Evans that if he testified against Petitioner, Hahn would ensure that Evans would not be implicated in the Beasley murder.  *Id.*, 446 P.3d at 253, 7 Cal. 5th at 1077.  The court noted that Petitioner conceded that there was no direct evidence supporting this accusation and cited the testimony of the officers involved in the Beasley investigation, which the referee found credible, who denied that they stopped investigating Evans in exchange for his testimony at Petitioner's trial.  *Id.*, 446 P.3d at 253, 7 Cal. 5th at 1076.  The

court also noted that "besides [a] generalized expectation of their working relationship continuing past [Petitioner's] trial, [Petitioner] presented no evidence of any specific promises made by Hahn to Evans that were not otherwise disclosed or discovered during the course of [his] trial." *Id.*, 446 P.3d at 253, 7 Cal. 5th at 1077. Overall, the court accepted the referee's finding that "Evans received no threat or promise that was not otherwise disclosed or discovered during [Petitioner]'s trial." *Id.*

      I.    <u>Question Seven: "Did penalty[-]phase prosecution witness Hoze provide false testimony regarding [Petitioner's] involvement in the murder of inmate David Jackson?  If so, what was the false testimony?"</u> (*Id.*, 446 P.3d at 253, 7 Cal. 5th at 1077).

      The court agreed with the referee's finding, unchallenged by both parties, that there was no basis to believe that Hoze provided false testimony at trial, or to credit Hoze's post-trial recantations of that testimony. *Id.*

      J.    <u>The California Supreme Court's Denial of Petitioner's Habeas Petition</u>

      In light of the referee's report, the Supreme Court concluded that Petitioner did not prove by a preponderance of the evidence that he was entitled to habeas relief. *Id.*, 446 P.3d at 261, 7 Cal. 5th at 1089. Petitioner made multiple claims for relief, which the court organized into general categories and subcategories. Finding no merit to the claims, the court addressed each as follows.

      i.    Presentation of False Evidence

      Petitioner contended that both Willis and Evans testified falsely during trial, and that the evidence that he authored the notes to Willis was false. *Id.*, 446 P.3d at 254-55, 7 Cal. 5th at 1078-80. Based on the referee's conclusion that Willis and all the BGF members who testified during the referee's hearing were not credible, the court found that Petitioner had not presented sufficient evidence of specific false testimony to warrant habeas relief. *Id.* The court also rejected Petitioner's claim that Hoze testified falsely during the penalty phase based on the referee's conclusion that there was no evidence of false testimony. *Id.*, 446 P.3d at 255, 7 Cal. 5th at 1080.

      On the other hand, the Supreme Court agreed with the referee that Evans testified falsely at trial about his relationship as an informant with Agent Hahn. *Id.*, 446 P.3d at 254, 7 Cal. 5th at

United States District Court
Northern District of California

1078.  At the reference hearing, evidence showed, contrary to Evans's claim that he had only provided information to Hahn once, that Evans "had often been paid by various law enforcement agencies for his informant work, including work that had been arranged by Hahn," that "Hahn knew Evans previously had provided false information," and that "Evans had an expectation to continue his work as an informant after [Petitioner]'s trial." *Id.*, 446 P.3d at 255, 7 Cal. 5th at 1079.  The court concluded that "the false evidence at [Petitioner]'s trial provided the jury with an incomplete account of Evans and Hahn's relationship." *Id.*, 446 P.3d at 255, 7 Cal. 5th at 1080.

But the court found that this false evidence did not create a reasonable probability that the jury, had they known of it, would have returned a different verdict. *Id.*  The court characterized the additional evidence as "not so different from the evidence adduced at trial, which provided the jury ample knowledge about Evans for purposes of assessing his credibility." *Id.*, 446 P.3d at 255, 7 Cal. 5th at 1079.  The court noted that Petitioner's defense team "'staged an unsparing attack on Evans,'" vigorously attacking his credibility at trial. *Id.* (quoting Referee's Report).  The court also expressed the view that "Willis was the primary witness against [Petitioner], as he had personal knowledge about the conspiracy," and referenced its prior characterization that "'Evans's testimony served only to confirm Willis's testimony.'" *Id.* (quoting *Masters*, 365 P.3d at 897, 62 Cal. 4th at 1068).  Overall, the court found that "there was ample evidence at trial that provided the jury with strong reasons to question Evans's credibility and to view his testimony with caution or suspicion." *Id.*, 446 P.3d at 255, 7 Cal. 5th at 1080.

Ultimately, the court concluded that any false evidence that may have been adduced at trial did not affect the jury's verdict. *Id.*, 446 P.3d at 256, 7 Cal. 5th at 1081.  Ambiguity about who composed the notes Petitioner copied in his own handwriting did not undermine the inference that Petitioner was a part of the conspiracy to kill Burchfield. *Id.*  The court ruled that Petitioner did not show that there was a reasonable probability of a different verdict had the jury not heard that evidence. *Id.*

        ii.    Newly Discovered Evidence

In his state habeas petition, Petitioner asserted that newly discovered evidence undermined

United States District Court
Northern District of California

both his guilty verdict and his death sentence.  *Id.*  Petitioner claimed the following items were newly discovered evidence:

> (1) Willis's, Evans's, and Hoze's posttrial recantations of their trial testimony; (2) testimony that [Petitioner] did not fabricate the weapon used to kill Sergeant Burchfield; (3) Dr. Leonard's testimony that [Petitioner] did not author the notes introduced at his trial; (4) Evans's possible involvement in Beasley's killing; and (5) statements concerning Harold Richardson, which previously were unknown to [Petitioner].

*Id.*  The state supreme court concluded that none of this allegedly new evidence "would have more likely than not changed the outcome at trial."  *Id.*

The court relied on the findings of the referee to deny this claim in each of its subparts. With respect to the recantation issue, the court found that "[a]t best, [Petitioner] has demonstrated that these witnesses generally are liars, but he does not offer any persuasive reason to credit their recantations over their trial testimony."  *Id.*, 446 P.3d at 257, 7 Cal. 5th at 1082.

The court accepted the referee's determination that the witnesses who testified about the fabrication of the weapon were not credible.  *Id.*, 446 P.3d at 257, 7 Cal. 5th at 1082-83.  The court also observed that:

> In addition to their lack of credibility, [Petitioner's] witnesses named multiple possible fabricators, but they could not all have fabricated the weapon used to kill Burchfield.  Given the inconsistencies in and between their testimony, it is not more likely than not that the evidence now presented about the weapon's fabrication would have changed the outcome of the trial.  Moreover, [Petitioner's] participation in the conspiracy was not limited to helping fabricate the weapon.

*Id.*, 446 P.3d at 257, 7 Cal. 5th at 1083.

The court again found that "evidence that [Petitioner] did not author the notes [to Willis] does not establish that their contents were false," noting that "a reasonable jury could have believed that although [Petitioner] copied and did not author the notes, he still participated in the planning of the attack and sharpened the weapon that was used."  *Id.*  And the court found that Petitioner's "attempt[] to further undermine the credibility of Willis' testimony" did not persuade it that "it is more likely than not that the outcome of the trial would have been different, especially

since Willis's credibility was litigated extensively at trial." *Id.*, 446 P.3d at 257, 7 Cal. 5th at 1083.

Although evidence of Evans's possible involvement in the killing of Beasley was likely new, the court determined that such evidence would not more likely than not have changed the outcome of the trial. *Id.*, 446 P.3d at 258, 7 Cal. 5th at 1084.

Finally, the court concluded that evidence from the redacted portions of interviews with Harold Richardson, and some related law enforcement reports regarding Richardson, were new, but found that those materials, which "present[ed] no new information from Richardson about Burchfield's murder," "enhance[d] only slightly Richardson's credibility" and "would [not] have altered our conclusion that Richardson's statements were not sufficiently trustworthy." *Id.*, 446 P.3d at 258, 7 Cal. 5th at 1084-85. The court again noted that in the statements, "Richardson implicated himself and did not mention [Petitioner]." *Id.*, 446 P.3d at 258, 7 Cal. 5th at 1084.

### iii.    Prosecutorial Misconduct

In the habeas petition, Petitioner claimed that the prosecutors committed misconduct that rendered his trial unfair. *Id.*, 446 P.3d at 258, 7 Cal. 5th at 1085. First, Petitioner claimed that the prosecution obtained Willis's testimony through improper coercion, specifically threatening to send him back to San Quentin, where he feared he would be killed by other inmates. *Id.* The court found that Willis was not credible in making this statement and that Petitioner provided no evidence to support the claim. *Id.*, 446 P.3d at 259, 7 Cal. 5th at 1086.

Second, Petitioner argued that the prosecution violated *Brady* by failing to disclose threats or promises of leniency made to Evans. *Id.* In denying Petitioner's direct appeal, the court had "generally agreed[ed] with [Petitioner] that the prosecutor disclosed incomplete information about the extent of the agreement concerning the benefits Evans received to testify." *Id.*, 446 P.3d at 261, 7 Cal. 5th at 1088. But the court concluded that the evidence was not material under *Brady* because "the jury knew that Evans had testified in exchange for measures to protect his safety." *Id.* Regarding the additional evidence presented at the reference hearing establishing "Evans and Hahn's preexisting, ongoing relationship," the court held that this evidence was not material under

1    *Brady* because it "[did] not materially alter the calculus" with respect to the jury's assessment of

2    Evans's credibility given the substantial evidence presented at trial on that point.  *Id.*  The court

3    also noted that "Evans appeared to have been motivated primarily by his desire to avoid being sent

4    to state prison[, and] the jury already knew that Evans provided Hahn information in exchange for

5    measures to protect his safety."  *Id.*, 446 P.3d at 261, 7 Cal. 5th at 1088-89.  Finally, the Court

6    rejected Petitioner's claim that the prosecution knowingly presented false evidence because there

7    was no evidence of such knowledge, as Petitioner conceded at the reference hearing.  *Id.*, 446 P.3d

8    at 261, 7 Cal. 5th at 1089.

9    **III.    DISCUSSION**

10         Under Federal Rule of Civil Procedure ("Rule") 12(c), a party may move for judgment on

11   the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Judgment on

12   the pleadings may be granted "when the moving party clearly establishes on the face of the

13   pleadings that no material issue of fact remains to be resolved and it is entitled to judgment as a

14   matter of law."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.

15   1989).  The parties appear to agree that the pleadings in this habeas case include the entire state

16   court record.  *See* Dkt. No. 47 at ii, 9; Dkt. No. 54 at 2, 4.

17        A federal district court sitting in habeas review of a state-court decision must abide by the

18   strictures of the Anti-Terrorism and Effective Death Penalty Act of 1994 ("AEDPA").  28 U.S.C.

19   § 2254.  "AEDPA mandates a highly deferential standard for evaluating state-court rulings, which

20   demands that state-court decisions be given the benefit of the doubt."  *Reis-Campos v. Biter*, 832

21   F.3d 968, 973 (9th Cir. 2016) (*citing Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)) (internal

22   quotation marks omitted).  Under AEDPA, a petitioner must demonstrate that the state court's

23   adjudication of the merits of his or her claim resulted in a decision "(1) that was contrary to, or

24   involved an unreasonable application of, clearly established federal law, as determined by the

25   Supreme Court of the United States; or (2) resulted in a decision that was based on an

26   unreasonable determination of the facts in light of the evidence presented in the state court

27   proceeding."  28 U.S.C. § 2254(d).  A federal court must presume the correctness of the state

28   court's factual findings; a petitioner may only rebut the presumption with clear and convincing

United States District Court
Northern District of California

26

1    evidence.  28 U.S.C. § 2254(e)(1).  In applying these standards, a federal court looks to the "last

2    reasoned decision" by a state court.  *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010).

3           The "contrary to" and "unreasonable application" clauses of Section 2254(d) have separate

4    and distinct meanings.  A state court's decision is "contrary to" clearly established federal law if it

5    fails to apply the correct controlling authority or if it applies the correct authority to facts

6    materially indistinguishable from those in a controlling case but reaches a different conclusion.

7    *See Williams v. Taylor*, 529 U.S. 362, 404, 413-14 (2000).  A decision involves an "unreasonable

8    application" of Supreme Court law if "the state court identifies the correct governing legal

9    principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

10   Additionally, a state court's decision may be an "unreasonable application" of Federal law if it

11   "extends or fails to extend a clearly established legal principle to a new context in a way that is

12   objectively unreasonable."  *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir. 2002).

13          The Supreme Court has emphasized that "an *unreasonable* application of federal law is

14   different from an *incorrect* application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 101

15   (2011) (citing *Williams*, 529 U.S. at 410).  "A state court's determination that a claim lacks merit

16   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

17   the state court's decision."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  This

18   means that "a federal habeas court may not issue the writ simply because the court concludes in its

19   independent judgment that the relevant state-court decision applied clearly established federal law

20   erroneously or incorrectly.  Rather, that application must be objectively unreasonable."  *Lockyer v.*

21   *Andrade*, 538 U.S. 63, 75-76 (2003) (internal citations omitted).  Additionally, "[h]oldings of the

22   United States Supreme Court at the time of the state court decision are the only definitive source

23   of clearly established federal law under AEDPA.  While Circuit law may be 'persuasive authority'

24   for purposes of determining whether a state court decision is an unreasonable application of

25   Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only

26   these holdings need be reasonably applied."  *Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1309

27   (N.D. Cal. 2012) (internal citations omitted).

28

United States District Court
Northern District of California

1

United States District Court
Northern District of California

A.    Claim One: Exclusion of Harold Richardson Statements

Claim One asserts that the California Supreme Court unreasonably applied *Chambers v. Mississippi*, 410 U.S. 284 (1973), when it affirmed the trial court's exclusion of the confession of Harold Richardson, an alleged co-conspirator in the murder.  Dkt. No. 1 at 12.  *Chambers* held that the "right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."  *Chambers*, 410 U.S. at 294.  Defending against the State's accusations requires both the ability to confront and cross-examine the witnesses against the defendant and the "opportunity to be heard in his defense" by calling "witnesses in [his] own behalf."  *Id.*  Petitioner claims that the trial court abrogated his due-process right to present a defense by excluding Richardson's statements as hearsay lacking sufficient indicia of reliability to qualify for an exception to the hearsay rule.  Dkt. No. 1 at 12-13. Petitioner identifies the August 1986 interview in which Richardson "admitted he was a member of the BGF hit squad and admitted to having been one of the four BGF members who planned Sergeant Burchfield's murder and having sharpened the knife that ultimately was used to kill Sergeant Burchfield."  *Id.* at 12.  Petitioner further relies on a memorandum drafted by the interviewer in which "Richardson indicated he knew 'all the details about the Burchfield murder,' identified Willis, Woodard, and Johnson as the other planners, identified ten individual members of the BGF who participated in the attack, and described their respective roles," and argues that "[d]espite this exhaustive list, Richardson never suggested [Petitioner] played any kind of role in Sergeant Burchfield's murder."  *Id.*  And Petitioner references Richardson's later letter to the investigator.  *Id.*  Petitioner argues that the exclusion of these statements was contrary to, and an unreasonable application of, clearly established federal law, specifically *Chambers*.  *Id.* at 17-35.

In *Chambers*, the Supreme Court considered the admissibility of hearsay statements made by an uncharged individual, Gable McDonald, who had confessed to shooting the victim Chambers had been found guilty of killing.  *Chambers*, 410 U.S. at 285-88.  Five months after the killing, McDonald gave a sworn statement to Chambers's attorneys, in which he confessed to shooting the victim and stated that he had told a friend that he had used his own .22 caliber revolver to shoot the victim.  *Id.* at 287.  McDonald later repudiated that confession at a

28

preliminary hearing.  *Id.* at 288.  Chambers discovered, however, that McDonald had admitted to three friends in the days after the shooting that he had shot the victim.  *Id.* at 289.  At his trial, Chambers attempted to call McDonald as an adverse witness so that, under state law, he would be subject to cross-examination, but the trial court refused to deem McDonald to be adverse.  *Id.* at 291.  Stymied in this effort, Chambers attempted to call the three friends to whom McDonald confessed to testify to McDonald's confessions, but the trial court excluded their testimony as hearsay.  *Id.* at 292-93.

In reversing Chambers's conviction, the Supreme Court ruled that the exclusion of evidence violates due process where the excluded statement bears "persuasive assurance of trustworthiness" and is critical to the defense.  *Chambers*, 410 U.S at 302.  As the confession of a witness who was at the scene of the crime, the evidence was critical to the defense.  *Id.*  The Court also found that the statements bore several indicia of reliability:

> First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred.  Second, each one was corroborated by some other evidence in the case.  . . . The sheer number of independent confessions provided additional corroboration for each.  Third, . . . each confession here was in a very real sense self-incriminatory and unquestionably against interest. McDonald stood to benefit nothing by disclosing his role. . . . Finally, if there was any question about the truthfulness of the extrajudicial statement, McDonald was present in the courtroom and was under oath.  He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.  The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, *Brown v. State*, . . . and from the *Donnelly*-type situation, since in both cases the declarant was unavailable at the time of trial.

*Id.* at 300-01.  These factors supported the conclusion that the hearsay statements were sufficiently trustworthy and sufficiently important to the defense that they should not be excluded: "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  *Id.* at 302.

The California Supreme Court ruled that, notwithstanding the possibility that Richardson's statements were against his penal interest and thus subject to a state-law hearsay exception,[2] the

---

[2] California Evidence Code Section 1230 provides an exception to the exclusion of hearsay

statements "were properly excluded on the ground that they were insufficiently trustworthy and therefore unreliable." *Masters*, 365 P.3d at 889, 62 Cal. 4th at 1057.  In its consideration of the exclusion of third-party confessions under the hearsay rule by California state courts, the Ninth Circuit has found it consistent with federal law for the state court to focus on the trustworthiness of the excluded statement. *Phillips v. Herndon*, 730 F.3d 773, 776 (9th Cir. 2013).  In *Phillips*, the court determined that that the state court's ruling that the proffered third-party confession was untrustworthy and therefore properly excluded was not unreasonable in part because the declarant "gave three conflicting and contradictory versions of the murder." *Id.* at 777.[3]

       The state supreme court's ruling that the trial court did not abuse its discretion in excluding the Richardson statements was not contrary to or an unreasonable application of *Chambers* or any federal law regarding a defendant's right to present a defense.  The Supreme Court credited the trial court's determination that the Richardson statements were untrustworthy because they were made well over a year after the murder, by a convicted felon. *Masters*, 365 P.3d at 889-90, 62 Cal. 4th at 1057.  Additionally, the Richardson statements did not have unambiguous probative value: although the statements allow for an inference that Richardson played the role attributed by the prosecution to Petitioner, the Supreme Court found that they did not explicitly exculpate Petitioner, or mention him at all. *See* 446 P.3d at 246, 7 Cal. 5th at 1065

---

statements made by a declarant "having sufficient knowledge of the subject" if the declarant is unavailable and the statement is "so far contrary to the declarant's pecuniary . . . interest, or so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." CAL. EVID. CODE § 1230.

[3] The Ninth Circuit has provided some additional guidance to courts that must determine in a habeas proceeding whether a petitioner's due process rights were violated by the exclusion of evidence. *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985).  To weigh the importance of the excluded evidence against the state's interest in exclusion, the court may consider:

> (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.

*Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller*, 757 F.2d at 994).  If the habeas court determines that the five factors lean in the petitioner's favor, AEDPA requires the court to evaluate whether the exclusion was reasonable or unreasonable. *See Chia*, 360 F.3d at 1006-07.

United States District Court
Northern District of California

1   (finding that "Richardson implicated himself in the attack but did not mention [Petitioner]); 365

2   P.3d 888, 62 Cal. 4th 1054 (characterizing statement as "Richardson said he helped make knives

3   for the BGF, including the one that was used to stab Sergeant Burchfield"). As the court noted,

4   "[Petitioner's] participation in the conspiracy was not limited to helping fabricate the weapon."

5   446 P.3d at 257, 7 Cal. 5th at 1083. Further, the Richardson evidence was not the sole evidence at

6   trial with respect to Petitioner's participation in the conspiracy: the prosecution called several

7   witnesses who identified Petitioner as a part of the conspiracy and introduced notes in Petitioner's

8   own handwriting that confirmed his role.

9          Petitioner has not shown that the Supreme Court's conclusion was contrary to or an

10   unreasonable application of *Chambers*. In *Chambers*, McDonald made the excluded confessional

11   statements spontaneously in the hours and day following the shooting. 410 U.S at 300. By

12   contrast, Richardson waited over a year and only came forward with information to aid his own

13   efforts in disassociating with the BGF. *Masters*, 365 P.3d at 887-88, 62 Cal. 4th at 1054.

14   Although Richardson put himself at great risk from both the State and the BGF by confessing to

15   being a part of the conspiracy—a factor that could be considered to bolster his statement's

16   reliability—reasonable jurists could agree with the Supreme Court's conclusion that Richardson

17   had plenty of time to learn of the facts of the crime and strong motivation to give the prison

18   officials information that would speed his protection from his former fellow gang members. *Id.*,

19   365 P.3d at 890, 62 Cal. 4th at 1057. It also was not unreasonable for the Supreme Court to

20   distrust the unsworn testimony of a convicted felon who claimed to play the precise role in the

21   conspiracy that Petitioner's other unavailable witness, Charles Drume, also claimed. *Id.* In

22   addition, Richardson, unlike McDonald in *Chambers*, was not available to be cross-examined by

23   the prosecution regarding his confessions. The fact that no one could challenge Richardson's

24   confession distinguishes Petitioner's case from *Chambers*.

25          Petitioner cites several cases from the Ninth Circuit, but these cases do not change the

26   Court's conclusion. In *Chia*, the court confronted "reliable material evidence of Chia's

27   innocence," including four statements made by a participant to police immediately after the crime

28   that Chia was not involved in the crime and instead attempted to convince that participant not to

United States District Court
Northern District of California

31

commit the crime. *Chia,* 360 F.3d at 999-01. Chia thus had the benefit of directly exculpatory statements made by a man DEA agents witnessed committing the crime and which corroborated Chia's version of why he took the actions the DEA agents witnessed. *Id.* at 1000-02. Likewise, in *Cudjo v. Ayers*, 698 F.3d 752, 755-57 (9th Cir. 2012), and *Lunbery v. Hornbeak*, 605 F.3d 754, 761-62 (9th Cir. 2010), the excluded statements at issue directly exculpated the defendants, confessing to crimes in cases involving weak circumstantial evidence of the defendants' guilt. In contrast, in this case there was considerable other evidence of Petitioner's guilt, and even if Richardson's statements had been sufficiently trustworthy, they did not directly exculpate Petitioner. This Court cannot conclude, therefore, that the Supreme Court's decision with respect to the trial court's exclusion of the Richardson statements was contrary to or an unreasonable application of *Chambers*. Petitioner's motion is denied as to Claim One.

### B.   Claim Two: Exclusion of Charles Drume Statements

In Claim Two, Petitioner again contends that the California Supreme Court ruled contrary to, or unreasonably applied, *Chambers* when it affirmed the trial court's exclusion of the confession of Charles Drume. Dkt. No. 1 at 32. In his confession, which he made some two-and-a-half years after the murder, Drume claimed to have held the role of Chief of Security for the BGF in Carson Section and to have manufactured the weapon used to kill Sergeant Burchfield. *Id.* As with the Richardson statements, the court ruled that the trial court's exclusion of Drume's statements as hearsay was not error because the statements lacked sufficient indicia of trustworthiness. *Masters*, 365 P.3d at 890-91, 62 Cal. 4th at 1058. In reaching this conclusion, the court pointed both to the timing of the statements and to Drume's status as a convicted felon: "Like Richardson, Drume could have been motivated to make the statements to curry favor with law enforcement, or to enhance his reputation among other prisoners. In addition, Drume had even more time than Richardson to glean information about the conspiracy before giving his version of events." *Id.*, 365 P.3d at 891, 62 Cal. 4th at 1058.

The state court's conclusion was not unreasonable. Although Drume confessed to playing the same role as Petitioner in the conspiracy, the fact that Richardson's statements made the same

claim undermined the probative value of that confession.  Petitioner argues that because Drume's

confession was against his penal interest, he had been caught manufacturing weapons three

months prior to the murder, and he had weapons in his possession just weeks after the attack, his

statements were reliable.  Dkt. No. 47 at 20-21.  These coincidences, however, do not erase the

fact that Drume's statements were inconsistent with not only the Richardson statement but also the

testimony at trial, none of which indicated that Drume had a role in the conspiracy or even a

position in the BGF.  *See generally Masters*, 365 P.3d at 871-75, 62 Cal. 4th at 1027-32.  Finally,

although the statements may have been important to Petitioner's claim that he was not involved in

the conspiracy, the inconsistencies with Petitioner's other proffered exculpatory evidence would

have undermined that value considerably.  For these reasons, the Supreme Court's decision with

respect to the exclusion of the Drume statements was not contrary to or an unreasonable

application of *Chambers*.  This claim is denied.

### C.   Claim Three: *Brady* Claim

Petitioner's third claim asserts that the State withheld material exculpatory evidence and

that the California Supreme Court's determination that the evidence was not material was an

unreasonable application of *Brady v. Maryland*, 373 U.S. 83 (1963).  Dkt. No. 1 at 41.  One of the

State's key witnesses, Bobby Evans, was an informant who claimed that Petitioner had confessed

to him his participation in the conspiracy to murder Sergeant Burchfield.  *Id.* at 42.  Petitioner

claims that the State withheld the following information that would have been effective in

undermining Evans's credibility: (1) Evans was a repeat informant who "had repeatedly and quite

consistently provided the State false information in the past;" (2) "Evans and Parole Officer James

Hahn had a pre-existing, ongoing working relationship," the extent of which was not accurately

described during trial; (3) Hahn had promised Evans that in exchange for his testimony, he would

have Evans's sentencing for an unrelated conviction postponed; and (4) that Evans was a suspect

in an unsolved murder in San Francisco at the time of Petitioner's trial.  *Id.*  Because Evans's

testimony was crucial to the State's case against Petitioner, Petitioner argues, this withheld

evidence, which could have cast Evans as deeply unreliable and motivated to provide testimony in

1    favor of the State's theory of the case, was material.  *Id.* at 42-43.  The state supreme court's

2    decision to the contrary was unreasonable, according to Petitioner.  *Id.* at 53.

3           Due process imposes an "inescapable" duty on the prosecutor "to disclose known,

4    favorable evidence rising to a material level of importance."  *Kyles v. Whitley*, 514 U.S. 419, 438

5    (1995); *see also Brady*, 373 U.S. at 87.  Favorable evidence includes both exculpatory and

6    impeachment material that is relevant either to guilt or punishment.  *See United States v. Bagley*,

7    473 U.S. 667, 674–76 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  Promises of

8    immunity or leniency are "a wholly different kind of impeachment evidence" because they permit

9    the inference that the witness has "an interest in fabricating his testimony."  *Horton v. Mayle*, 408

10   F.3d 570, 580 (9th Cir. 2005).   The prosecutor is charged with knowledge of any *Brady* material

11   of which her office or the investigating law enforcement agency is aware, even where the evidence

12   is "known only to police investigators and not to the prosecutor."  *Kyles*, 514 U.S. at 438; *see*

13   *Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (*per curiam*); *United States v. Price*,

14   566 F.3d 900, 908-09 (9th Cir. 2009).

15          When determining the materiality of withheld evidence, "[t]he question is not whether the

16   defendant would more likely than not have received a different verdict with the evidence, but

17   whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

18   confidence."  *Kyles*, 514 U.S. at 434.  Evidence is material under *Brady* "if there is a reasonable

19   probability that, had the evidence been disclosed to the defense, the result of the proceeding would

20   have been different."  *Bagley*, 473 U.S. at 682.  "A 'reasonable probability' is a probability

21   sufficient to undermine confidence in the outcome."  *Id.*  When there are multiple *Brady* claims, a

22   court must consider materiality "collectively."  *Kyles*, 514 U.S. at 436.

23          The California Supreme Court held in both the direct appeal and Petitioner's habeas corpus

24   case that the prosecution withheld evidence that Petitioner could have used to impeach Evans.  On

25   direct appeal, the court found that the prosecution omitted information regarding the promises

26   Agent Hahn made in exchange for Evans's testimony:

27              The record indicates that Evans and Agent Hahn entered into an
                agreement in which Evans agreed to provide information in exchange
28              for efforts to keep him safe, that is, to not return him to state prison.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

> Evans pleaded guilty to obtain a relatively short prison term, and Agent Hahn took steps to postpone his actual sentencing, which resulted in Evans serving his sentence in the relative safety of the Alameda County jail. As part of that plan, Agent Hahn also took steps to rescind the sentence for Evans's parole violation, which also prevented Evans from returning to state prison.

*Masters*, 365 P.3d at 896-97, 62 Cal. 4th at 1067-68. After the referee's evidentiary hearing, the court disagreed with Petitioner that the prosecution failed to disclose information regarding threats made to Evans and the information that Evans was a person of interest in another murder investigation. *Masters*, 446 P.3d at 260-61, 7 Cal. 5th at 1087-88. On the other hand, the court restated its view that the prosecution disclosed incomplete information regarding Evans's hope of continuing as an informant and additional details about his relationship with Agent Hahn. *Id.*; *see also Masters*, 446 P.3d at 261, 7 Cal. 5th at 1088 ("In [Petitioner]'s automatic appeal, we generally agreed with him that the prosecutor disclosed incomplete information about the extent of the agreement concerning the benefits Evans received to testify.").

As to the second prong of *Brady*, however, the Supreme Court concluded that there was not a reasonable probability that the result of the trial would have been different had this information been disclosed. On direct appeal, the court gave multiple reasons for finding that the withheld evidence was not material: (1) "the gist of the agreement—information in exchange for safety—was known to [Petitioner] and heard by the jury;" (2) "Evans's [early] release from jail[, about which the jury did not know,] did not materially alter what the jury already knew about his inducement to testify;" and (3) "Evans's credibility was thoroughly attacked at trial, and the jury was well aware of his other criminal acts in addition to his attempted robbery conviction." *Masters*, 365 P.3d at 897, 62 Cal. 4th at 1068. In its denial of the habeas petition, the court found that the additional evidence regarding Evans's relationship with Hahn was not material for two reasons:

> Initially, we doubt that Evans's expectations regarding future assignments as an informant induced him to testify against Masters; Evans appeared to have been motivated primarily by his desire to avoid being sent to state prison, as he feared the BGF would retaliate against him for providing information about its members to law enforcement. Even if we were to agree that Evans's testimony might have been motivated partially by his desire for future assignments, such additional motivation was not material under *Brady* because the

> jury already knew that Evans provided Hahn information in exchange
> for measures to protect his safety.

*Masters*, 446 P.3d at 261, 7 Cal 5th at 1088-89.  Ultimately, the court concluded that the evidence that Evans had a more extensive and ongoing relationship as an informant for Hahn and others did "not materially alter the calculus" of the credibility determination because the jury received substantial evidence about the reasons Evans testified and was aware of his extensive criminal history and work for the BGF.  *Id.*

Evaluating the objective reasonableness of the state court's rejection of Claim Three requires this Court to assess the nature of the impeachment of Evans at trial against how the withheld evidence could have impacted the jury's consideration of his credibility if used to impeach him.  *See Reis-Campos*, 832 F.3d at 975 (in case involving petitioner's claim of self-defense in a fatal shooting, Ninth Circuit concluded that "we cannot say that it was unreasonable for the state court to conclude that the jury had still heard sufficient information regarding [shooting victim's] history of violence").  While testifying on direct examination, Evans admitted to his lengthy criminal history, consisting of five felony convictions and four stays in state prison. Reporter's Transcript of Trial, Vol. 58, at 13668: 1- 13670: 21, People v. Masters, Marin Superior Ct. No. 10467 (October 30, 1989).  He admitted that he was awaiting sentencing on another felony conviction.  *Id.* at 13670: 22 – 12672: 2.  He testified that he had been a member of the BGF for well over ten years, that he was taught its revolutionary and military philosophy, that he held several positions of authority, and that he carried out violent and illegal acts for the BGF both inside and outside of prison.  *Id.* at 13673: 9 – 13692: 17.

The prosecution used Evans as an expert to testify about BGF activities.  On *voir dire*, Evans revealed even more of his violent past and work for the BGF.  He admitted to stabbing people in one prison around ten times, *id.* at 13694: 16-25; robbing fifteen or twenty banks when he was not in prison, *id.* at 13695: 12 – 13696: 2; stabbing people in San Quentin around five or six times, *id.* at 13696: 25 – 13697: 4; and doing all these things to advance in authority in the BGF.  *Id.* at 13698: 1 – 13699: 11.  He likewise admitting to ordering violent acts and crimes both inside and outside of prison when he held positions of authority.  *Id.* at 13709: 5 – 13711: 3.

1    Cross-examination of Evans produced similar admissions, including admissions by Evans

2    that he frequently lied when it was to his own advantage.  Although Evans first stated that he only

3    met with Agent Hahn once, it became clear that he gave the officer incriminating information

4    about more than one BGF member, including a Mr. Kane, Johnny Wells, and Roy Smith.  *Id.* at

5    13794: 23-27, 13795: 15 – 13798: 11.  He confirmed his role in leading BGF street crime when he

6    was out of prison, extorting money from drug dealers and dealing drugs.  *Id.* at 13811: 26 – 13813:

7    24.  He admitted to lying about his release date to Wells and to his significant other, and to lying

8    to defense investigators.  *Id.* at 13821: 10 – 13821: 22; Reporter's Transcript of Trial, Vol. 59, at

9    13885: 11 – 13886: 1, People v. Masters, Marin Superior Ct. No. 10467 (October 31, 1989).

10   Considering the extent to which Evans's credibility was attacked and undermined at trial,

11   the California Supreme Court's conclusion that the withheld evidence was not material was not

12   objectively unreasonable.  Throughout his testimony, Evans painted himself as a violent convicted

13   felon and gang leader who knew how to take advantage of opportunities to serve or protect

14   himself.  The jury heard that he contacted Agent Hahn some four years after the Burchfield

15   murder, when he was at risk of returning to state prison and being confronted by the gang on

16   which he had been informing.  *Id.* at 13897: 17 – 26.  Additionally, the jury heard that he had no

17   qualms about lying to protect himself or when it was to his advantage.  The withheld information

18   about the extent of his relationship with Hahn and the advantage that relationship gave him in his

19   sentencing for attempted robbery may have given the jury somewhat more reason to doubt his

20   credibility and discredit his testimony, but it was not meaningfully different in kind or scope from

21   the extensive impeachment evidence the jury did hear.

22   It was not unreasonable for the state court to find that the jury had a thorough basis for

23   understanding the type of witness before them.  That Agent Hahn considered Evans to be a liar

24   may not have had a substantial impact on a jury that heard Evans admit as much himself.  The

25   evidence Evans provided regarding Petitioner's participation in the conspiracy was mostly

26   corroborative of the Willis testimony and the words written in Petitioner's own hand.  The jury

27   had significant other evidence regarding Evans himself on which to determine what weight it

28   would give to his testimony.  This Court cannot conclude that it was objectively unreasonable for

United States District Court
Northern District of California

37

1  the Supreme Court to find that there was not a reasonable probability of a different result had the

2  withheld evidence been disclosed.

3     Petitioner's motion is denied as to Claim Three.

4     D.  <u>Claim Four: *Napue* Claim</u>

5

6     In Claim Four, Petitioner cites the withheld evidence regarding Evans's position as a

7  regular, but allegedly unreliable, informant for the State to argue that the State also violated *Napue*

8  *v. Illinois*, 360 U.S. 264 (1959), by not correcting testimony that it knew or should have known to

9  be false. Dkt. No. 1 at 59.  A state "may not knowingly use false evidence, including false

10  testimony," against a defendant to obtain a conviction or sentence.  *Napue*, 360 U.S. at 269.  Such

11  a conviction "obtained by the knowing use of perjured testimony is fundamentally unfair[] and

12  must be set aside if there is any reasonable likelihood that the false testimony could have affected

13  the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted).  A

14  conviction obtained "when the State, although not soliciting false evidence, allows it to go

15  uncorrected when it appears," violates due process, even when the evidence goes only to the

16  credibility of a witness.  *Napue*, 360 U.S. at 269.  To demonstrate a violation of *Napue*, a

17  petitioner must show: (1) the evidence or testimony was actually false; (2) the prosecution knew or

18  should have known of the falsity; and (3) the false evidence was material, meaning that there is a

19  reasonable likelihood that it affected the jury's decision.  *See Hein v. Sullivan*, 601 F.3d 897, 908

20  (9th Cir. 2010).

21     Although it found that false evidence was presented at trial, the Supreme Court did not

22  directly address the *Napue* standard.  Instead, it denied the claim based on its finding that the false

23  evidence was not material.  The court accepted the referee's finding that Evans testified falsely

24  "concerning Evans and Hahn's preexisting, ongoing working relationship . . . because [he] failed

25  to adequately describe the nature and extent of their relationship."  *Masters*, 446 P.3d at 254, 7

26  Cal. 5th at 1078.  It concluded, however, that Petitioner did not show that the withheld evidence

27  was material, or that there was a reasonable probability that the false evidence affected the jury's

28  decision.  *Id.*, 446 P.3d at 255, 7 Cal. 5th at 1079-80.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The California Supreme Court based its materiality determination on California precedent

2    that tracks the more circumscribed materiality standard set out in *Brady* instead of *Napue*'s

3    "reasonable likelihood" standard.  *Id.*, 446 P.3d at 254, 7 Cal. 5th at 1078 (citing *In re Figueroa*,

4    412 P.3d 356, 365, 4 Cal. 5th 576, 588-89 (2018)).   But "[a] state court need not cite or even be

5    aware of" the cases that define clearly established federal law under AEDPA for its holding to

6    survive a challenge under Section 2254(d) as long as the court's reasoning is not contrary to or an

7    unreasonable application of that law.  *Richter*, 562 U.S. at 98.  If it is "possible to read the state

8    court's decision in a way that comports with clearly established federal law . . . we must do so."

9    *Mann v. Ryan*, 828 F.3d 1143, 1157-58 (9th Cir. 2016) (*en banc*).

10    Because the standards for assessing the materiality of *Brady* and *Napue* errors differ, the

11    Ninth Circuit has developed a protocol for "analyzing collective prejudice for concurrent *Brady*

12    and *Napue* violations."  *Reis-Campos*, 832 F.3d at 977.[4]  According to the Court of Appeals:

> The *Napue* and *Brady* errors cannot all be collectively analyzed under
> *Napue's* "reasonable likelihood" standard, as that would overweight
> the *Brady* violations. On the other hand, they cannot be considered in
> two separate groups, as that would fail to capture their combined
> effect on our confidence in the jury's decision. To resolve this
> conflict, we first consider the *Napue* violations collectively and ask
> whether there is "any reasonable likelihood that the false testimony
> *could* have affected the judgment of the jury." If so, habeas relief must
> be granted.
>
> However, if the *Napue* errors are not material standing alone, we
> consider all of the *Napue* and *Brady* violations collectively and ask
> whether "there is a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding *would* have been
> different." At both stages, we must ask whether the defendant
> "received . . . a trial resulting in a verdict worthy of confidence."

*Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (citations omitted).

23    Petitioner has not shown any reasonable likelihood that Evans' false testimony could have

24    affected the jury's decision to convict, or that the California Supreme Court's rejection of this

25    claim was unreasonable.  As explained above, the jury heard that Evans worked with Hahn

---

[4] Courts must measure the materiality of both types of errors "collectively, not item by item."  *See*
*Kyles*, 514 U.S. at 436.

1    multiple times and sought favor in exchange for his testimony.  They heard that that he had the

2    ability and propensity to lie.  They had significant information with which to assess his credibility.

3    Knowing that this trial was not his first time in the informant's seat could have given them more

4    fuel to doubt his current testimony, or it could have done the opposite.  Fair-minded jurists could

5    disagree as to whether there is any reasonable likelihood that Evans's lies about the extent of his

6    relationship with Agent Hahn could have affected the judgment of the jury.  *See Richter*, 562 U.S.

7    at 101; *Gill v. Ayers*, 342 F.3d 911, 920 (9th Cir. 2003) ("It is logical to conclude that if a case

8    presents an issue close enough for reasonable minds to differ, then a state court's decision

9    resolving that issue, even if incorrect, would not be objectively unreasonable."); *Reis-Campos*,

10   832 F.3d at 978 (no *Brady* or *Napue* violation where jury heard "significant testimony about [the

11   victim's] violent tendencies and status as the leader of a vicious gang" and nonetheless rejected

12   Petitioner's claims of self-defense); *Sivak v. Hardison*, 658 F.3d 898, 914 (9th Cir. 2011) (no

13   *Brady* or *Napue* violation despite witness perjury where "[t]here was simply too much evidence

14   placing Sivak at the scene of the crime while it occurred"); *cf. Hayes v. Brown*, 399 F.3d 972, 987

15   (9th Cir. 2005) (undisclosed evidence of "an additional, secret deal would not have been merely

16   cumulative impeachment").  The Supreme Court's rejection of this claim was not contrary to, and

17   did not unreasonably apply, *Napue*.

18           When considering the alleged *Brady* and *Napue* errors collectively under *Brady's* more

19   stringent standard, the conclusion remains the same.  The withheld evidence regarding the extent

20   of the Evans-Hahn relationship is the same evidence that the prosecutor left uncorrected.  Again,

21   the jury saw Evans thoroughly impeached with his history of violence, gang activity, charged and

22   uncharged felonies, and propensity to lie when it served him.  It was not unreasonable for the

23   Supreme Court to conclude that there was no reasonable probability that the truth about Evans's

24   extensive history as an informant would have altered the jury's judgment and changed the result of

25   the proceeding.

26           For these reasons, Petitioner's motion is denied as to both Claims Three and Four.

27

28

United States District Court
Northern District of California

E.   Claim Five

For his final claim, Petitioner asserts that it would be a fundamental miscarriage of justice for the State of California to execute him because he is actually innocent. Dkt. No. 1 at 61. The federal habeas court is not the proper venue to assert a claim for actual innocence with regard to a state conviction: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Petitioner has not established as a matter of law that there was any underlying constitutional violation in the state proceeding that led to his conviction.

Petitioner's motion is thus denied as to Claim Five.

## IV.   CONCLUSION

The Court finds that Petitioner has not proven as a matter of law that the California Supreme Court unreasonably applied or made any ruling contrary to any clearly established federal law in affirming Petitioner's conviction and sentence and dismissing his habeas corpus petition. The Motion for Judgment on the Pleadings, Dkt. No. 47, is therefore **DENIED**.[5]

//

//

//

//

//

---

[5] In a concurring opinion attached to the majority opinion denying the state habeas petition, Justice Liu (joined by Justice Cuellar) observed that "[w]e have no occasion in this posture to consider whether, in light of the trial evidence as well as the reference hearings and findings, we can be confident of the verdict beyond a reasonable doubt." *In re Masters*, 446 P.3d at 262, 7 Cal. 5th at 1090. The concurrence also explained that the court did not "have occasion here to consider whether, in light of all relevant circumstances, the fact that Masters was sentenced to death—while his codefendants Andre Johnson (the actual killer) and Lawrence Woodard (a prison gang 'lieutenant' who, according to one witness, 'had given the order for Burchfield's murder'[]) were not—may be indicative of arbitrariness in the application of the death penalty." *Id.* (internal citation omitted). This Court recognizes and echoes these observations, while also concluding that the motion for judgment on the pleadings must be denied under the controlling AEDPA legal standard.

The parties are directed to meet and confer and provide within 60 days a joint case management statement outlining their proposal for the next steps in this case.  The Court observes that given Petitioner's decision to proceed with a motion for judgment on the pleadings, it is unclear what further proceedings are warranted in light of the findings made in this order.

**IT IS SO ORDERED.**

Dated:  June 20, 2024

HAYWOOD S. GILLIAM, JR.
United States District Judge